Bradley D. Owens, Esq.
Jermain, Dunnagan & Owens, P.C.
3000 A Street, Suite 300
Anchorage, AK  99503
Telephone:  (907) 563-8844
Facsimile:   (907) 563-7322

Counsel for Defendant

## UNITED STATES DISTRICT COURT

## DISTRICT OF ALASKA

| | |
|---|---|
| A.M., by and through his parents, R.M. and A.M.,<br><br>          Plaintiffs<br><br>vs.<br><br>FAIRBANKS NORTH STAR BOROUGH SCHOOL DISTRICT,<br><br>          Defendant | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Case No. 3:05-cv-0179 (TMB)<br>) |

## DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

Defendant Fairbanks North Star Borough School District ("FSD"), by and through its attorneys, Jermain, Dunnagan & Owens, hereby submits this memorandum both in opposition to plaintiffs' Motion for Summary Judgment as well as in support of its Cross-Motion for Summary Judgment.[1]

### I.     ISSUES RAISED

The issue raised by plaintiffs in this matter, as described at page 1 of their Memorandum, is "whether AM should have been denied a full day of preschool by the District based upon his individual unique needs and consistent with all required procedures of the IDEA."  Plaintiffs also

---

[1]     Although these motions are submitted as ones for summary judgment, this matter is more properly an appeal based on an administrative record under the IDEA.

contend that FSD committed procedural violations. However, defendant FSD respectfully submits that the Decision issued by Hearing Officer Gallagher contains thorough and complete findings, to which this court must give deference under the IDEA.

## II. STANDARD OF REVIEW

The proper standard of review in appeals of administrative decisions arising under the IDEA is that the court must "give due weight to the hearing officer's administrative proceedings;" in addition, the court is not permitted to "substitute [its] own opinions of sound educational policy for those of the school authorities" in these cases. *Adams v. State of Oregon*, 195 F.3d 1141, 1145 (9th Cir. 1999). In recognition of the expertise of the administrative agency, the court must carefully consider the findings made by the Hearing Officer and endeavor to respond to the Hearing Officer's resolution of each material issue. *Id*. The amount of deference depends on whether the hearing officer findings are "thorough and complete." *Id*.

Moreover, an "appropriate" educational program under the IDEA "does not mean the absolutely best or potential maximizing services for the child." *Id*. at 1149, citing *Gregory K. v. Longview School District*, 811 F.2d 1307, 1314 (9th Cir. 1987). School districts are only required to provide a "basic floor of opportunity" through an educational program that is individually designed to provide meaningful educational benefit to a child with a disability. *Id*. Thus, the pertinent inquiry is whether the program for the child, at the time it is developed, is appropriately designed and implemented so as to convey meaningful benefit—not whether the program was adequate in light of the child's progress under the program. *Id*. This is so because courts "do not judge the program in hindsight;" rather, courts must look to the "goals and goal achieving methods at the time the plan was implemented and ask whether these methods were reasonably calculated to confer … a meaningful benefit" on the child. *Id*.

### III.   HEARING OFFICER'S FINDINGS

The Decision by the Hearing Officer (hereinafter "HO") describes the 10 issues raised by the parents and the relief they requested. IOR 2, Dec. pp. 1-3. The Decision then provides a description of the "Factual Background" as determined by the HO. *Id*., pp.4-14. This Factual Background is a complete and thorough review of the credible evidence presented by the parties at the hearing. It also provides a preface for the detailed and careful Findings of Fact made by the HO in the Decision. *Id*., pp. 15-19.

#### A.   Factual Background

AM was born September 30, 2000. At the time of the hearing, he was 4 years old. The initial testing of AM was done by Kathie Kenaston, a speech-language pathologist, on February 16, 2004. *Id*., p. 4. Based on that testing, she determined that he was at least two standard deviations below normal in the areas of receptive and expressive language skills. *Id*. It was her opinion that AM was eligible for special education services as a result. *Id*. The parents also had AM tested by Sue Guinn, a private speech-language therapist, in February 2004 and he began to receive services from her. *Id*.

After the testing by Ms. Kenaston, FSD contacted the parents to advise them that AM was eligible for pre-school special education services. *Id*. The parents were advised that AM could receive services in the pre-school program at Weller Elementary School, which was taught by Denise Newman, a certificated special education teacher with a Master's degree in special education. *Id*.; IOR 16, Tr. 570. Ms. Newman scheduled a meeting for February 25 to discuss the educational program for AM. *Id*. at p. 5. Both parents attended this meeting, which was the first special education meeting either had attended. *Id*. Besides the parents, AM and Ms.

Newman, Robert Heyman, the speech-language pathologist at Weller Elementary, also attended this meeting as did Louise Anderl, the school Principal. *Id*. and IOR 14, Tr. pp. 437 & 531.

At this meeting, Ms. Newman presented a draft educational plan (IEP) for AM that she had prepared prior to the meeting as a "working tool" for the participants to use. Dec., p. 5; IOR 16, Tr. pp. 579-586. Ms. Newman included in the draft IEP services and goals for AM that she thought he might need, based on her experience as a pre-school special education teacher. *Id*. The draft IEP provided for 2 ½ hours of services in the morning pre-school program at Weller Elementary, which would be provided by Ms. Newman. *Id*. Mr. Heyman also provided speech-language services for AM in two half-hour individual segments and one half-hour group segment in the classroom each week. *Id*.

During this meeting, there was a discussion about an evaluation to determine if AM needed occupational therapy (OT) services. IOR 16, Tr. 580-81; IOR 12, Ex. M & N. After the OT evaluation, the IEP for AM was amended on April 8, 2004 to provide OT services for him at school. Dec., p. 7. These services began April 9 and were provided to AM for 30 minutes a week for the remainder of the 2003-4 school year by Heidi Kubichek, a licensed occupational therapist. *Id*.; IOR 15, Tr. 496-97. The OT services were increased to 60 minutes a week during the 2004-5 school year. Dec., p. 7; IOR 15, Tr. 503-4.

By agreement, AM actually began to receive services in Ms. Newman's pre-school class on March 11. Dec. at p. 6; IOR 16, Tr. 587-88. This delayed start date was to introduce him to the classroom in order to help transition him into the program routine. *Id*. AM attended the morning pre-school session for the rest of the 2003-4 school year. Although the parents requested the afternoon session, that was not possible since all positions in that class were full, as AM entered pre-school at the end of the school year. *Id*. & at p. 17 (Finding # 13); IOR 14, Tr.

108 & 166. However, AM did attend the afternoon pre-school at Weller beginning in October 2004 once his private speech services were re-arranged. *Id*.; IOR 13, Ex. 30, pp. 13-19.

In April/May 2004, AM was evaluated by Dr. Lu Juan Gibson, the school psychologist. Dec., p. 7. This evaluation was done at the request of the parents so that the information from the school would be available to Dr. Ronald Brennan, a pediatrician who evaluated AM in June 2004. *Id*. In his July 23, 2004 report, Dr. Brennan evaluated AM and diagnosed several conditions including autism. Dec., p. 8; IOR 13, Ex. 13, p. 8. AM was also evaluated in June 2004 by Dr. Sheila Clarson, a psychologist. *Id*.; IOR 13, Ex. 13A. Dr. Clarson's testing was consistent with and validated the evaluation by Dr. Gibson. IOR 13, Ex. 13A, p. 6. Neither Drs. Gibson, Clarson nor Brennan testified at the hearing. Dec., p. 15.

In early October 2004, the parents included a note to Ms. Newman, the pre-school teacher, in AM's school notebook that they felt he needed to attend both the morning and afternoon sessions of pre-school. IOR 13, Ex. 30, p. 19; Dec., pp. 8-9. However, Ms. Newman wrote back and advised the parents that the District did not provide a full-day program for any pre-school students. *Id*., p. 9; IOR 13, Ex. 30, p. 19. In response to the parents request for more information, a meeting was scheduled for October 28 to discuss this. Dec., p. 9. After carefully reviewing the evidence, the HO determined this meeting was an informational meeting rather than a formal IEP meeting, which triggered procedural requirements. *Id*.; IOR 13, Ex. 17, p. 1 of the added transcript ("The reason why we called this meeting is that the parents we (sic) requested that we sit down and chat about things.").[2]

---

[2]   The HO also had available and listened to the tapes of this meeting. IOR 12. Her determination of what occurred in this meeting is based on her review of the tapes, transcripts and notes of the meeting. Dec., p. 9.

**DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**
*A.M., et al. v. Fairbanks North Star Borough School District*                                              Page 5
Case No. 3:05-cv-1079 (JWS)

During this informational meeting, the parents were advised that both FSD and other Alaska school districts offer only half-day pre-school programs. *Id.* In addition, the parents were advised during this meeting that even for students with autism, a "full day intensive program for preschoolers is too much. It's not developmentally appropriate." Linda Robertson, the FSD Coordinator for intensive and preschool services, was the person who attended this meeting and provided this information to the parents.[3] At the hearing, Ms. Robertson testified that if the IEP team determined that AM needed a full-day program, it could have been implemented. IOR 14, Tr. 240.

A subsequent meeting was held on December 10, 2004, as a follow-up to the October 28 meeting and to discuss educational planning for AM. Dec., p. 9; IOR 13, Ex. 21, p. 1. At this meeting—a formal IEP meeting—the parents expressed their desire that AM receive an "all inclusive ABA" program of the length and intensity they understood was recommended by the "experts." *Id.*; IOR 13, Ex. 20, p 2. This meeting was tape-recorded; transcripts were prepared by both parties and offered as exhibits in the hearing. IOR 13, Ex. 20, pp. 1-20 (parents) and 20A, pp. 1-27 (FSD).[4] After the HO reviewed the transcripts of this December meeting, she stated, "it appears to me that this is what an IEP meeting should be – the parents and the district providers cooperatively reviewing a student's performance, exchanging information on what works at home and school and making suggestions back and forth as to what might work and how the goals and objectives should be developed and met." Dec., p. 10. At the end of this meeting, Eve Lambert, the Special Education Director for FSD, told the parents that she believed

---

[3] This information was reiterated in testimony during the hearing. IOR 14, Tr. 242.

[4] The tapes made by the parents (Ex. 20B) and those made by FSD (Ex. 40) were also made part of the record. IOR 13.

much of what the parents were requesting—use of an ABA program—was actually occurring but was "labeled" differently than "ABA" methodology. *Id.*

Thereafter, the parents contacted CCCD, a private organization located in Connecticut that provides services for children with autism. *Id.* Erica Roest, with CCCD, evaluated AM in January 2005 utilizing many of the same tests utilized by Drs. Brennan and Clarson. *Id.* She also observed AM at home on one occasion for two hours in his pre-school program at Weller. *Id.*, p. 11. Ms. Roest issued a report in February 2005 stating her opinion that AM would benefit from a full day intensive therapeutic program utilizing ABA. IOR 13, Ex. 29, p. 23. This program would consist of 10 hours a week in the school classroom with typical peers and an additional 30 hours a week of intensive direct one to one instruction through discrete trial training. *Id.*, pp. 24-25. This would be a two-year program with the first year focusing almost exclusively on one to one instruction, with the second year focused more on generalized learning in the regular education classroom environment. *Id.*, p. 26.

A draft IEP was developed for AM by the IEP team on February 15, 2005. Dec., p. 12; IOR 14, Ex. TT. Although the parents did not attend this meeting, because they were on vacation, a copy of the draft IEP was sent to them for their review and input. Dec., p. 12. After the parents received the draft IEP, they notified FSD that they rejected the IEP because it did not provide a thirty-hour a week ABA program for AM supervised by a "Board Certified Behavior Analyst." *Id.*; IOR 13, Ex. 25. They also stated that they felt if AM was to make any meaningful progress, he needed a program that provided "1 on 1 intensive ABA intervention." *Id.*

The HO carefully and thoroughly reviewed this draft IEP as well as the testimony provided at the hearing. Dec., p. 13. Even though it was clear that this IEP was only a draft and

therefore subject to change and further discussion, AM was withdrawn from his Weller pre-school program on April 22 since the parents had contracted with CCCD in March to provide an intensive exclusive ABA program for AM. *Id.*

### B.   Findings of Fact

In addition to the Factual Background provided by the HO, she also made specific Findings of Fact. Dec., pp. 15-19. Pertinent to the issue raised in this appeal are the following findings:[5]

4.  Student was categorized as ECDD at student's first IEP meeting. (Ex. 4)

6.  District's evaluation covered the areas of concern expressed in the Child Find documents. (Ex. 5)

7.  Parents' consent form (Ex. 2) refers to evaluations in gross and fine motor skills. These evaluations were done by Ms. Kubichek subsequent to student's enrollment at Weller and the results were reflected in the IEP amendment of April 8, 2004 and pursuant to the District's practice of allowing a student time to transition to a new setting. (Tr. p. 62)

8.  Parents had student evaluated at their expense by Sue Guinn. The evaluation found student to be significantly deficient in both pragmatics and semantics, basically a social communication disorder rather than a developmental language disorder.

9.  Student's IEP of February 25, 2004 was developed without the parents' benefit of receipt of K. Kenaston's report and with neither the parent nor the District having the benefit of Ms. Guinn's report.

---

[5]   These findings are identified by the number used by the HO in her Decision at pages 15-19.

11. I find the District was deficient in not providing the parents with K. Kenaston's report but that did not prevent them from including proper speech and language goals in the Feb. 2004 IEP.

13. I find the District's testimony credible that Weller was the only school in the spring of 2004 that had an opening for student and that his bus ride to Weller although long could not be helped because when he started, the distance from his home and the already organized routes.

14. I find that student's IEP of February 2004 provided goals of improving his self-help skill, his language skills and his pre-academic which were reasonable goals based upon the information known at the time.

15. I find that after approximately one month in school that his IEP was amended, April 8, 2004, to provide for OT services of 30 minutes/week for the 04 school year and 60 minutes a week for the 04-05 year. This was based on observations of the classroom teacher and the parents' request for an OT referral as part of their Child Find document consents.

17. Student was diagnosed with autism, hyperactivity disorder, pica and disruptive behavior disorders by Dr. Ronald Brennan and Dr. Sheila Clarson in a report of July 23, 2004. Their findings mirrored findings of student testing done by Dr. Gibson of the District in late spring 2004.

18. Student returned to Weller pre-school and Ms. Newman in the fall of 2004, parents not having requested a transfer and no testimony was received as to openings at that time in other schools closer to student's home.

19. In October of 2004, mother requested that student receive a full day of pre-school. This was denied because the District only offered half-day sessions to all of their pre-schoolers. No denial of FAPE resulted to the student from this. There was no testimony as to the total number of pre-schoolers, the number of teachers and classes and whether or not a full day of pre-school would have been possible. There was testimony from Linda Robertson that she believed that a full day for a student of AM's age was not developmentally appropriate. There is not consensus on this point.

20. On October 28, 2004 an information meeting was held between the parents and district personnel. The credible evidence in the record reflects that it was an informational meeting not an IEP meeting.

21. A follow-up meeting was held on December 20 (sic). I find that the District in that meeting made it clear that they had an open mind as to what methodology could and should be used for student and that it believed that it was currently using ABA techniques. There was no evidence of closed minds or pre-determinism reflected in the minutes (sic). In fact it reflected what, in my opinion, an IEP meeting should be.

22. In January of 2005, parents had student evaluated by the CCCD and in March of 2005, entered into a contract with the organization to provide services to their son. I find that from January of 2005, if not before, that the parents were committed to an ABA program for their son and were not willing to entertain any other approaches.

23. Ms. Roest in her evaluation of student found that his behaviors impeded his learning. This was based upon her two hour evaluation of him in a classroom and library setting. I find that the conclusion of his teaching staff in the February 2005 IEP that

his behaviors did not impede his learning was more credible based upon their greater contact with and time to observe student.

24. Parents' rejection of the February 2005 [IEP] was based upon their commitment to the ABA approach. District had reiterated its willingness to adopt at least some of the ABA methods and the February 2005 [IEP] referred to direct instruction. While some jurisdictions as discussed later are moving to a mandated ABA or primarily ABA program, most jurisdictions still allow a district to provide the methodology it thinks is best suited to the individual child, even if that is a mixture of ABA, pure Lovaas, Teacch (sic) or some combination thereof. I find that the IEP offered to student in February 2005 did not deny FAPE. The document was a working draft and by rejecting the proposal out of hand and withdrawing student from the District, the District was precluded from incorporating more of the parents' suggestions or ideas the District received from the Autism Partnership training its staff received in March and April of 2005.

Finally, the HO provided a review of the law and cases applicable to this matter in a portion of the Decision under the heading of "Discussion." Dec., pp. 19-24. In this Discussion section of the Decision, the HO carefully and thoroughly discusses various cases cited by the parties and analyzes the applicability of these cases. In particular, the Decision reviews and rejects the case primarily relied upon by the parents before the HO and now in this appeal: the case of *Deal v. Hamilton County Board of Education*, 392 F.3d 840 (6th Cir. 2004), which had to do with pre-determined programs. The HO noted that FSD had not pre-determined the program for AM but remained open to training in and use of the ABA method. Dec., p. 20. Most

appropriate to this appeal is the determination by the HO that "disagreement [by the District with the program proposed by the parents] is not pre-determinism." *Id*., p. 21.

The HO also distinguished this matter from the facts in the *Deal* case and others by explaining that the evidence of any pre-determination was lacking in the evidence submitted to her at the hearing. She carefully reviewed the testimony of Ms. Roest, the parents' expert witness, and explained why she gave her testimony less weight and credence than that submitted by the FSD witnesses. *Id*. The HO specifically ruled that in one of the other cases, the student required more hours of intensive therapy and the program offered by the school district was inadequate to meet the student's needs. *Id*., p. 22. However, the HO determined that was not the case in this matter based on the credible evidence submitted since FSD offered and provided an appropriate program to meet AM's needs; offered and provided an ESY program for AM during the 2004 summer; FSD could describe the program methodology utilized to educate AM; and FSD was willing to incorporate ABA in AM's program. *Id*. Finally, the HO relied upon the credible testimony of the FSD witnesses who testified that AM had in fact made gains and received educational benefit under his IEP. *Id*., p. 23. The record contains ample evidence to support this determination. *See* IOR 15, Tr. 444, 451 & 464 (Heyman); 506 & 514-15 (Kubichek); and IOR 16, Tr. 602, 639-43 & 686 (Newman).

## IV.   DISCUSSION

### 1.   The HO's findings in the Decision are thorough, careful and complete.

As described earlier, this court must "give due weight to the hearing officer's administrative proceedings;" in addition, the court is not permitted to "substitute [its] own opinions of sound educational policy for those of the school authorities" in these cases. *Adams v. State of Oregon*, 195 F.3d 1141, 1145 (9th Cir. 1999). This requirement is based on the

recognition of the expertise of the administrative agency; thus, the court must carefully consider the findings made by the Hearing Officer and endeavor to respond to the Hearing Officer's resolution of each material issue.  *Id*.

The IDEA does not require that an "appropriate" educational program must be "the absolutely best or potential maximizing services for the child."  *Id*. at 1149, citing *Gregory K. v. Longview School District*, 811 F.2d 1307, 1314 (9th Cir. 1987).  School districts are only required to provide a "basic floor of opportunity" through an educational program that is individually designed to provide meaningful educational benefit to a child with a disability.  *Id*.  Thus, the pertinent inquiry is whether the program for the child, <u>at the time it is developed</u>, is appropriately designed and implemented so as to convey meaningful benefit—not whether the program was adequate in light of the child's progress under the program.  *Id*.  This is so because courts "do not judge the program in hindsight;" rather, courts must look to the "goals and goal achieving methods at the time the plan was implemented and ask whether these methods were reasonably calculated to confer … a meaningful benefit" on the child.  *Id*.

Here, the findings made by the HO based on the evidence presented at the hearing are entitled to due weight and deference by this court.  As described above, the Decision identifies and responds to all of the issues raised by the parents.  The HO carefully reviewed and considered all of the evidence offered, made credibility determinations where appropriate and necessary, and thoroughly explained why each issue raised was resolved as it was.  This is true both generally, as well as specifically to the two issues raised in this appeal by the parents—the full-day program and the procedural issues.

Additionally, as the parties who have filed this appeal, the parents bear the burden of demonstrating that the FSD did not comply with the IDEA.  *Clyde K. v. Puyallup School District*

*No. 3*, 35 F.3d 1396, 1399 (9th Cir. 1994). Moreover, in the recent decision by the U.S. Supreme Court in *Schaffer v. Weast*, 546 U.S. __, 163 L.Ed.2d 387, 393 (2005), the Court held that the burden of proof—of persuasion—in an IDEA administrative proceeding lies with the party seeking relief. In this case, the parents are the parties seeking relief.[6]

### 2. The IEP was based on the individual needs of AM, was reasonably calculated to provide educational benefit and did provide FAPE.

It bears repeating that the IDEA does not require that an "appropriate" educational program must be "the absolutely best or potential maximizing services for the child." *Adams*, 195 F.3d at 1149, citing *Gregory K. v. Longview School District*, 811 F.2d 1307, 1314 (9th Cir. 1987). School districts such as FSD are only required to provide a "basic floor of opportunity" through an educational program that is individually designed to provide meaningful educational benefit to a child with a disability. *Id*.

The critical issue is whether the program for the child, <u>at the time it is developed</u>, is appropriately designed and implemented so as to convey meaningful benefit—not whether the program was adequate in light of the child's progress under the program. *Id*., 195 F.3d at 1145. This is because courts "do not judge the program in hindsight;" rather, courts must look to the "goals and goal achieving methods at the time the plan was implemented and ask whether these methods were reasonably calculated to confer … a meaningful benefit" on the child. *Id*. Moreover, the court is not permitted to "substitute [its] own opinions of sound educational policy for those of the school authorities" in these cases. *Id*.

---

[6] Although Alaska previously assigned the burden of proof to the school district by regulation, that regulation was amended by the Alaska State Board of Education on March 16, 2006 and is now consistent with the *Schaffer* ruling.

**DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**
*A.M., et al. v. Fairbanks North Star Borough School District*                                      Page 14
Case No. 3:05-cv-1079 (JWS)

In this matter, AM began school close to the end of the 2003-4 school year. The IEP team—including his parents—developed his IEP in February 2004 and he began attending school on March 11, 2004. The areas of concern—his delay in expressive and receptive language skills—were specifically addressed in the IEP with goals and objectives based on what the team knew of AM at the time. Based on a concern for possible fine and gross motor needs, a further evaluation was done and the IEP team—including his parents—amended the IEP to add OT goals and objectives. Based on what his teacher and providers observed during the last couple months of the 2003-4 school year, an ESY program was developed for AM for that summer. There was no request by the parents for any program other than the one that the IEP team developed for AM in February 2004, based on what the team knew at that time.

There was no request for a full-day program for AM until October 2004, after the start of the 2004-5 school year. AM returned to the pre-school class with Ms. Newman as his teacher again and continued to receive speech and OT services as well. Based on the evaluations done by Drs. Gibson, Clarson and Brennan, AM was diagnosed with autism. However, there is no credible evidence that AM required a full-day program in order to receive FAPE. The only evidence in the record is the report of Dr. Brennan which states that AM could greatly benefit from "intensive early intervention." However, nowhere in Dr. Brennan's report—or in any other expert reports—is there mention or recommendation that AM requires a full-day pre-school program to receive FAPE. The only evidence at all is that his parents felt he needed a full-day program. The feelings and beliefs of the parents about the needs of their child are important information that the IEP team must consider; however, their feelings and beliefs do not determine whether an IEP is reasonably calculated to provide educational benefit for the child.

> 3.  **The failure to provide a PWN did not seriously infringe the parents' ability to participate in the IEP process.**

In the Ninth Circuit, before a finding of denial of FAPE is proper there must be evidence to demonstrate a substantive harm resulting from a procedural violation. Procedural error constitutes a denial of FAPE <u>only</u> when they result in either the loss of educational opportunity for the child, or when it significantly restricts parental participation in the IEP formation process. *M.L. v. Federal Way Sch. Dist.*, 394 F.3d 634, 653 (9th Cir. 2005). There is no evidence in the record in this matter that either procedural violation raised in this appeal resulted in a loss of educational opportunity or significantly restricted the parents' participation in the IEP process.

The parents raise two procedural violations in this appeal: the failure to provide a copy of the initial evaluation report and the failure to provide a prior written notice to the parents. However, as the HO determined, based on her careful and thorough review of the credible evidence in the record, these procedural violations constitute harmless errors—that is, they did not result in either loss of an educational opportunity for AM, or deny him FAPE, or seriously infringe the parents' opportunity to participate in the IEP process.

The initial speech/language evaluation report by Kathie Kenaston consists of four pages. IOR 12, Ex. 2A. It concludes, in the "Summary and Recommendations," that although standardized testing is incomplete, based on observed and reported behaviors that AM's receptive and expressive language skills are significantly delayed (at least 2 standard deviations below the norm), his pragmatic or social language is also significantly below same age peers and his speech intelligibility is profoundly delayed. The report concludes "[AM] would benefit from a preschool program designed to improve receptive, expressive and pragmatic language, social interaction, and speech intelligibility." *Id*. at p. 2. Parents do not specify how receipt of this report prior to the February 2004 IEP meeting would have altered the program or resulted in a

full-day program for AM. Indeed, there is no mention or recommendation for a full-day program in the report. After careful review of this report and all of the testimony by the IEP team participants at this meeting, the HO specifically determined and made a finding that the failure to provide this report "did not prevent [the parents] from including proper speech and language goals in the Feb. 2004 IEP." Dec., p. 16 (Finding # 11).

Parents also assert that the HO erred "as a matter of law" in determining that the failure of FSD to follow strict procedural requirements for prior written notice did not "impede the parents' ability to participate in IEP meetings and their child's education." They contend that FSD's failure to provide a "reason" why it was "refusing" a full-day program violates the prior written notice requirements. However, once again, the HO gave careful consideration to all of the credible evidence presented at the hearing and issued detailed reasons why any such failure did not restrict the parents' ability to participate in the IEP meetings and formulation process. As the 9th Circuit ruled in *M.L.*, whether or not a procedural violation was harmless error depends on the "total circumstances" of the case. 394 F.3d at 656. The findings of the HO in this matter are entitled to be given deference in this appeal since they are thorough and complete.

## V.    CONCLUSION

The parents have failed to carry their burden in this matter of demonstrating that the denial of a full-day program for AM resulted in a denial of FAPE under the IDEA. They have also failed to carry their burden of establishing that any procedural error by FSD resulted in either a denial of educational opportunity for AM, or seriously restricted their ability to participate in the IEP process. Thus, they have failed to show on these two points of appeal that they are entitled to the relief they request.

The Decision issued by the HO in this matter is complete and thorough, involving a careful review of the evidence presented by the parties in the hearing and a detailed resolution of the issues presented, based on the credible evidence in the record. That Decision is entitled to be given deference by this court—the court should hesitate to impose its own notions of educational policy since the IDEA depends upon the expertise of school personnel to make these fact-intensive and complex decisions regarding educational policy and programs.

FSD respectfully submits the court should deny the appeal by the parents in this action.

Dated in Anchorage Alaska this 3rd day of April 2006.

JERMAIN, DUNNAGAN & OWENS, P.C.


\_\_\_\_s/ Bradley D. Owens_____
By:   Bradley D. Owens
      Alaska Bar #7610122


CERTIFICATE OF SERVICE

I hereby certify that the above document
was served on the 3rd day of April, 2006
via electronically on:

Sonja D. Kerr (skerr@dlcak.org)
Meg Allison (mallison@dlcak.org)
Disability Law Center of Alaska
3330 Arctic Blvd., Suite 102
Anchorage, Alaska  99503


s/Bradley D. Owens_____



6264.014 - 116648